UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRIAN BERNARD,

                    Plaintiff,

-against-

SUSAN MUELLER, et al.,

                    Defendants.

No. 23-CV-3323 (LAP)

OPINION AND ORDER

LORETTA A. PRESKA, Senior United States District Judge:

## I.    **Background**

### A. Factual Background

The Court assumes familiarity with its decision in related case Allen v. Mueller, No. 23-CV-5651, 2024 WL 3090141 (S.D.N.Y. June 21, 2024).  A streamlined version of the relevant facts and procedural history follows.

The above-captioned case arises from a class action brought by several named New York State Department of Corrections and Community Supervision ("DOCCS") inmates on behalf of a class of individuals in DOCCS custody whose medications were denied or discontinued after the institution of the Medications With Abuse Potential ("MWAP") Policy.  See Allen v. Koenigsmann, No. 19-CV-8173, 2023 WL 2731733 (S.D.N.Y. Mar. 31, 2023).[1]  (See also Allen I, Plaintiff's Memorandum of Law in Support of Motion for Class

---

[1] The Court will refer to the class action, 19-CV-8173, as "**Allen I**."

Certification, dated May 19, 2022 ("Pl. Class Cert. Br.") [19-CV-8173, dkt. no. 371] at 21.)[2]

DOCCS adopted the MWAP Policy in June 2017.  (See Stewart v. Mueller, Defendant Mueller's Local Civil Rule 56.1 Statement of Undisputed Facts, dated November 15, 2023 ("Mueller 56.1 Stmt.: Stewart) [23-CV-5668, dkt. no. 19] ¶ 3.)  The MWAP Policy required any DOCCS medical provider who sought to prescribe certain medications to submit an "MWAP Request" to the DOCCS Regional Medical Director ("RMD") in charge of the medical provider's facility.  (See id. ¶ 5.)  Before the DOCCS medical provider had authority to prescribe the requested medication for long-term use for chronic conditions, the RMD had to approve the MWAP Request. (See id.)

The stated purpose of the MWAP Policy was to control the prescriptions of medications that DOCCS believed might carry the risk of abuse or dependence by DOCCS inmates.  (See Rivera-Cruz v. Mueller, Declaration of A.J. Agnew in Opposition to Motion for Summary Judgment, dated December 27, 2023 ("Rivera-Cruz, Agnew Decl.") [23-CV-5657, dkt. no. 29], Ex. 23 [23-CV-5667, dkt. no. 29-25] at 2.)  Medications that required RMD approval under the

---

[2] Unless otherwise noted, page numbers cited herein reflect ECF page numbers, rather than page numbers of the parties' submissions. The Court will also cite page numbers using the various methods of pagination used by the parties in their exhibits (such as MD 000406).

MWAP Policy included Gabapentin (Neurontin), Lyrica (Pregabalin), Baclofen, Flexeril (Cyclobenzaprine), Ultram (Tramadol), Percocet, and Oxycodone. (See Mueller 56.1 Stmt.: Stewart ¶ 6.) DOCCS rescinded the MWAP Policy on February 8, 2021. (See State Represented Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, dated November 16, 2023 ("SRD 56.1 Stmt.: Gradia") [23-CV-5660, dkt. no. 24] ¶ 6.)

Plaintiffs in the class action asserted claims under 42 U.S.C. § 1983 alleging deliberate indifference to their medical needs due to DOCCS' implementation of the MWAP Policy and the discontinuation and denial of their medications that ensued. (Allen I, Second Amended Complaint, dated December 12, 2020 [19-CV-8173, dkt. no. 256] at 137-40.) Plaintiffs moved for class certification and for a preliminary injunction seeking relief from the ongoing effects of the MWAP Policy, arguing that DOCCS was continuing to deny effective treatment to patients who had lost their medications due to the MWAP Policy. (Allen I, Pl. Class Cert. Br. at 21-22; Allen I, Plaintiff and Plaintiff-Intervenors' Memorandum of Law in Support of Motion for Injunctions, dated May 31, 2022 [19-CV-8173, dkt. no. 378] at 8-9.)

On March 31, 2023, this Court issued an Opinion granting the Allen I Plaintiffs' motion to certify a class to pursue injunctive relief but denying the Plaintiffs' motion to certify a class to pursue damages. See Allen I, 2023 WL 2731733, at *6. The Court

held that plaintiffs in Allen I had failed to show that the proposed "liability class" had standing to sue under Article III of the United States Constitution. See id. at *2-3.

Also on March 31, 2023, the Court granted the Allen I plaintiffs' motion for a preliminary injunction, determining plaintiffs had demonstrated ongoing constitutional violations, including medically unjustified discontinuations of MWAP treatment and a likelihood of imminent future harm across the class. Allen I, No. 19-CV-8173, 2023 WL 2752375, at *22-23 (S.D.N.Y. Mar. 31, 2023).

After a four-day bench trial, this Court converted the preliminary injunction into a permanent injunction, concluding that remedying the constitutional violations in DOCCS' pain management practices outweighed the administrative challenges DOCCS would face in implementing a permanent injunction. Allen I, 700 F. Supp. 3d 110, 145 (S.D.N.Y. 2023). The Court then awarded attorneys' fees to Plaintiffs' counsel. (Allen I, Order, dated February 22, 2024 [19-CV-8173, dkt. no. 850] at 1.)

The Court of Appeals affirmed this Court's decision to grant a permanent injunction and award Plaintiffs' counsel attorneys' fees. Daniels et al. v. Moores, No. 24-30-pr, 2025 WL 883035, at *1 (2d Cir. Mar. 21, 2025) (summary order). The Court of Appeals credited the Court's determination that "the MWAP Policy was still de facto in place, despite being formally rescinded, because

4

prisoners in DOCCS custody continued to have their MWAP medications systematically denied without medical justification and without regard to medical need." (Id. at *2.) In addition, the Court of Appeals found no error in the Court's conclusion that Plaintiffs suffered Eighth Amendment violations and therefore irreparable harm. (Id. at *2-3.) In so holding, the Court of Appeals reiterated that "a deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians" and where defendants "reflexively rel[ied] on . . . the substance abuse policy when they had been put on notice that the medically appropriate decision could be, instead, to depart from the [policy] and prescribe [the medication] to the plaintiff." (Id. at *3 (citing Johnson v. Wright, 412 F.3d 398, 404, 406 (2d Cir. 2005).)

Following this Court's denial of certification of a "liability class," various plaintiffs filed individual suits for damages against various DOCCS employees, including RMDs, physicians, and nurse practitioners ("NPs"). (See, e.g., Amended Complaint as Severed from Allen I, filed June 30, 2023 ("AC: Daniels") [23-CV-5654, dkt. no. 1] at 3-5.) Similar to the allegations made in the class action, these plaintiffs each alleged violations of 42 U.S.C. § 1983 based on deliberate indifference to their medical needs. (See, e.g., id. ¶¶ 349-72.) Today's opinion

addresses the claims of Brian Bernard, Wilbert Dunbar, and Khalaire Allah.

Before the Court are the motions of Defendants Dr. David Dinello, Dr. Susan Mueller, Dr. Chung Lee, and Nurse Practitioner Brandi Lynn Corigliano for summary judgment. Memorandum of Law in Support of Defendants Dinello and Mueller's Motion for Summary Judgement, dated May 23, 2025 ("State Represented Defendants' Summary Judgment Motion")[23-cv-3323, dkt. 131]; Defendants' Memorandum of Law in Support of their Motion for Summary Judgement, dated May 23, 2025 ("Non-State Represented Defendants Summary Judgement Motion") [23-cv-3323, dkt. 138]. Plaintiff opposed. Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions for Summary Judgement, dated August 1, 2025 [23-cv-3323, dkt. 154]. Defendants replied. Reply Memorandum of Law in Further Support of Defendants Dinello and Mueller's Motion for Summary Judgement, dated September 10, 2025 ("State Defendants' Summary Judgment Motion Reply")[23-cv-3323, dkt. 156]; Non-State Represented Defendants' Reply Memorandum of Law in Support of their Motion for Summary Judgement, dated September 10, 2025 ("Non-State Defendants' Summary Judgment Motion Reply")[23-cv-3323, dkt. 131].

## II.  <u>Legal Standard</u>

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a).  "'It is the movant's burden to show that no genuine factual dispute exists.'"  I.M. v. United States, 362 F. Supp. 3d 161, 189 (S.D.N.Y. 2019) (quoting Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co., 373 F.3d 241, 244 (2d Cir. 2004)).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "On a motion for summary judgment, a fact is material if it 'might affect the outcome of the suit under the governing law.'"  Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of the City of N.Y., 746 F.3d 538, 544 (2d Cir. 2014) (quoting Liberty Lobby, Inc., 477 U.S. at 248).

"'In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.'"  In re AXA Equitable Life Ins. Co. COI Litig., 595 F. Supp. 3d 196, 215 (S.D.N.Y. 2022) (quoting Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995)).  In ruling on a motion for summary judgment, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks and citations omitted).

"If the movant meets its burden, 'the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.'" Kayo v. Mertz, 531 F. Supp. 3d 774, 787 (S.D.N.Y. 2021) (quoting Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008)). "The non-moving party 'cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.'" In re AXA, 595 F. Supp. 3d. at 215 (quoting Gottlieb v. Cnty. of Orange, 84 F.3d 511, 518 (2d Cir. 1996)). The non-moving party must "create more than a 'metaphysical' possibility that his allegations [a]re correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial.'" Wrobel v. Cnty. of Erie, 692 F.3d 22, 30 (2d Cir. 2012) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)).

## III. **Applicable Law**

### A. **Eighth Amendment**

The Eighth Amendment to the United States Constitution prohibits government officials from inflicting "cruel and unusual punishments" on those in their care. U.S. Const. amend. VIII. Pursuant to the right to be free from cruel and unusual punishments, the Eighth Amendment prohibits prisons officials from

8

acting with "deliberate indifference to serious medical needs of prisoners[.]" Estelle v. Gamble, 429 U.S. 97, 104 (1976).

A prison official can be held liable for deliberate indifference in violation of the Eighth Amendment "only when two requirements are met." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (internal quotations and citations omitted), abrogated in part on other grounds by Kravitz v. Purcell, 87 F.4th 111 (2d Cir. 2023). The first requirement the plaintiff must meet "is objective: the alleged deprivation of adequate medical care must be 'sufficiently serious.'" Id. (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). The second requirement "is subjective: the charged official must act with a sufficiently culpable state of mind." Id. at 280. Put differently, a plaintiff "must show, for each defendant, that the defendant acted with deliberate indifference to [his] medical needs." Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003) (citing Estelle, 429 U.S. at 104).

Satisfying the objective prong entails two inquires. First, the Court must assess "whether the prisoner was actually deprived of adequate medical care." Salahuddin, 467 F.3d at 279. The second part of the objective inquiry asks whether the deprivation or inadequacy of the plaintiff's medical care is "sufficiently serious." Id. at 280.

Determining if the deprivation of medical care is sufficiently serious is "necessarily contextual and fact-specific"

which requires "tailor[ing] [it] to the specific circumstances of each case." Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003) (cleaned up) (internal quotations and citations omitted). This includes examining the plaintiff's claim differently depending on whether he alleges the prison officials completely "fail[ed] to provide any treatment for [his] medical condition" or alleges only that the medical treatment he received was inadequate. See Salahuddin, 467 F.3d at 280.

If the former, the Court must "examine whether the inmate's medical condition is sufficiently serious." Id. at 280 (emphasis added). Certain factors courts consider when evaluating the seriousness of a medical condition include whether "a reasonable doctor or patient would find [the condition] important and worthy of comment or treatment," whether the condition "significantly affects an individual's daily activities," or "the existence of chronic and substantial pain." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotations and citations omitted). If, however, the plaintiff alleges only "inadequacy [] in the medical treatment [he was] given, the seriousness inquiry is narrower." Salahuddin, 467 F.3d at 280. Instead of determining the seriousness of the plaintiff's underlying condition, the Court must focus its inquiry "on the challenged delay or interruption in treatment[.]" Id. (citing Smith, 316 F.3d at 185). Such inquiry requires the Court to examine "the particular risk of harm" the

10

plaintiff faced as a result of the deprivation, "rather than the severity of the [plaintiff's] underlying medical condition[.]" Smith, 316 F.3d at 186.

Accordingly, the Court inquires how serious the plaintiff's underlying medical condition is if he alleges he was entirely denied care, whereas it must assess the "particular risks attributable" to a provision of allegedly insufficient care or the "severity of [a] temporary deprivation" in care if that is the deprivation the plaintiff alleges.    Id. at 186-87  (emphasis added).

To satisfy the subjective prong, i.e., to prove a prison official was deliberately indifferent to his or her medical needs, a plaintiff must "show that a particular defendant 'knows of and disregards an excessive risk to inmate health or safety.'" Brock, 315 F.3d at 164 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).  This standard is akin to a mental state of subjective recklessness, as used in criminal law.  See Salahuddin, 467 F.3d at 280.  The plaintiff may demonstrate the defendant's knowledge either by proving the official had actual knowledge of the risks to the plaintiff's health or by proving "that the risk was obvious or otherwise must have been known to [the] defendant[.]"  Brock, 315 F.3d at 164.

### B. Personal Involvement

Plaintiff asserts his Eighth Amendment claims pursuant to 42 U.S.C. § 1983.  Bernard, Complaint, dated Apr. 20, 2023 [23-cv-3323, dkt. 1] at 50-51.  To prevail on a § 1983 claim for a constitutional violation, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)).  Thus, to establish a particular defendant's liability, a plaintiff must "establish that [the particular defendant] violated the Eighth Amendment by [his or her] own conduct, not by reason of [his or her] supervision of others who committed the violation" and that each particular defendant "knew of and disregarded an excessive risk to [Plaintiffs'] health or safety."  Id. at 619 (citing Vega v. Semple, 963 F.3d 259, 273 (2d Cir. 2020)).

Such personal involvement requires "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred[.]"  Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996) (citing Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)).

### C. Qualified Immunity

The Supreme Court has held that "[g]overnment officials are entitled to qualified immunity [from liability] with respect to

12

'discretionary functions' performed in their official capacities."
Ziglar v. Abbasi, 582 U.S. 120, 150 (2017) (quoting Anderson v.
Creighton, 483 U.S. 635, 638 (1987)).    Whether a government
official can invoke qualified immunity "turns on the 'objective
legal reasonableness' of the official's acts."    Id. at 151
(quoting Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982)).    The
reasonableness of the official's actions "must be 'assessed in
light of the legal rules that were clearly established at the time
[the action] was taken.'"    Id. (quoting Creighton, 483
U.S. at 639).

To determine whether the official violated rights that were
"clearly established," the Court "must ask whether it would have
been clear to a reasonable officer that the alleged conduct was
unlawful in the situation he confronted."  Id. at 151-52 (internal
quotations and citations omitted).    "[I]f a reasonable officer
might not have known for certain that the conduct was unlawful[,]
then the officer is immune from liability."  Id. at 152.  As the
Supreme Court phrased differently in a previous case, the "right
must be sufficiently clear that every reasonable official would
have understood that what he [was] doing violate[d] that right."
Taylor v. Barkes, 575 U.S. 822, 825 (2015) (internal quotations
and citations omitted).

When confronted with the qualified immunity defense, the
Court must determine the scope of the right that the plaintiff

13

asserts was clearly established and that the official violated. There need not exist "a case directly on point" that addresses facts perfectly analogous to the instant case before the Court, "but existing precedent must have placed the statutory or constitutional question beyond debate." Id. (internal quotations and citations omitted). In other words, "the precise conduct at issue need not previously have been ruled unlawful" for the Court to conclude that the right was clearly established. Griffin v. Amatucci, 611 F. App'x 732, 734 (2d Cir. 2015) (summary order) (citing Zahrey v. Coffey, 221 F.3d 342, 357 (2d Cir. 2000)). As the Court of Appeals has noted in the specific context of claims of deliberate indifference in violation of the Eighth Amendment, assertions of qualified immunity "are not analyzed body-part by body-part" or with "specificity as to the site and cause of pain[.]" Collymore v. Myers, 74 F.4th 22, 30 (2d Cir. 2023). Such a "restricted view of the right" alleged to have been violated would be unnecessarily narrow in determining whether the right was clearly established at the time of its alleged violation. See LaBounty v. Coughlin, 137 F.3d 68, 74 (2d Cir. 1998).

On the other hand, "the clearly established right must be defined with specificity," and the "dispositive question is whether the violative nature of particular conduct is clearly established." Vega, 963 F.3d at 275 (emphasis in original) (internal quotations and citations omitted). Accordingly, the

14

Court must undertake this inquiry "in light of the specific context of the case, not as a broad general proposition." Id. In the context of claims for deliberate indifference, this means "'sufficiently serious' medical conditions 'should not be defined at a high level of generality.'" Collymore, 74 F.4th at 30 (quoting White v. Pauly, 580 U.S. 73, 79 (2017)).

## IV. Discussion

### A. Factual Background

Due to his preexisting conditions, Mr. Bernard entered DOCCS in 2014 with prescriptions for Celebrex and Neurontin. (See Declaration of A.J. Agnew in Opposition to Motion for Summary Judgment, dated July 26, 2025 ("Agnew Decl.") [23-CV-3323, dkt. no. 149], Ex. 28 [23-CV-3323, dkt. no. 149-33] at 2.) A May 2016 EMG showed severe chronic right L5 radiculopathy. (See Agnew Decl., Ex. 30 [23-CV-3323, dkt. no. 149-35] at 2.) Before DOCCS promulgated MWAP, Mr. Bernard was treated with a combination of Celebrex, low dose Percocet, and Neurontin by Defendant Dr. Chung Lee. (See Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, dated May 23, 2025 ("Non-State Represented Defendants' Statement of Undisputed Facts") [23-CV-3323, dkt. no. 133] ¶ 2; Agnew Decl., Ex. 29 [23-CV-3323, dkt. no. 149-34]at 13; Agnew Decl., Ex. 31 [23-CV-3323, dkt. no. 149-36] at 2, 4-5.) He also had been diagnosed with degenerative lumbar disc disease and had had a laminectomy at L4-L5 and L5-S1. (See Declaration of Dr.

15

Chung Lee, dated May 15, 2025 ("Lee Decl."), Ex. A Part I [23-CV-3323, dkt. no. 136-1] at 2.)

In June of 2017, after MWAP was promulgated, Dr. Lee submitted MWAP Request forms to Defendant RMD Susan Mueller to continue Mr. Bernard's prescriptions for Percocet and Neurontin. (See Non-State Represented Defendants' Statement of Undisputed Facts ¶ 4.) Dr. Mueller also forwarded the requests to Defendant RMD David Dinello via email. (See id. ¶¶ 5-7.) Dr. Mueller refused the Percocet and approved the Neurontin for only 30 days with no renewals saying "Recommended referral to Pain, Neurosurg, PT. Despite your comments to the contrary, he has never been referred to PT. Furthermore, there are safer agents without the abuse potential of Neurontin available for treatment of neuropathic pain. Consider use of Cymbalta or Lamictal (not 1:1, formulary). A dosing titrating schedule will be provided upon request." (See Bernard, Lee Decl., Ex. A Part II [23-CV-3323, dkt. no. 136-2] at 9.[3]) Dr. Dinello also responded to Dr. Lee, "I would definitely agree with Dr. Mueller. There is insufficient medical documentation to continue the use of Percocet for this Chronic Non-Palliative Issue." (Bernard, Agnew Decl., Ex. 41 [23-CV-3323, dkt. no. 149-56] at 2 (emphasis added).) Drs. Mueller and Dinello continued to email with Dr. Mueller's writing that Dr. Lee was one

---

[3] Note that page numbers on Ex. A to Dr. Lee are stamped numbers, not ECF.

16

of her "difficult and nasty ones" and Dr. Dinello's responding that he would continue to "respond to the ones you send for review." (Id.)

Had Dr. Mueller reviewed Mr. Bernard's medical records as she said she does, see Declaration of Susan Mueller, dated May 22, 2025 ("Mueller Decl.") [23-CV-3323, dkt. no. 129], (¶ 13) ["When I reviewed an MWAP Request under this policy, I would evaluate the patient's medical issues as a whole, taking into multiple factors, primarily the medical and social history of the particular patient, in determining whether the MWAP medication requested was in the best interests of the patient."], she would have noted the May 2016 EMG showing severe chronic right L5 radiculopathy, (Agnew Decl., Ex. 30 at 2), a diagnostic that she says "would be significant[.]"  (Mueller Decl. ¶ 14).  And, as she noted, "[Mr. Bernard] had been receiving 1200 mg of Neurontin consistently since July 2016," about a year, apparently without ill effect.  (Id. ¶ 29.)

Also on June 26, Dr. Mueller denied Dr. Lee's MWAP request for Percocet, saying "He is on maximal dosage of Neurontin, yet has never been to PT, Pain, Neurosurg, etc."  (Lee Decl., Ex. A Part III [23-CV-3323, dkt. no. 136-3] at 13.)  Dr. Mueller had approved the Neurontin, however, only for thirty days.  (Agnew Decl., Ex. 30 at 2.)

17

Dr. Lee reported that "attached to [Dr. Dinello's] e-mail was literature entitled 'Treatment of Painful Peripheral Neuropathies.' He said: "It was clear to me that Drs. Dinello and Mueller did not want me to prescribe Percocet." (Lee Decl., ¶ 22, Ex. A Part III-V [23-CV-3323, dkt. nos. 136-3-136-5] at 13-26.)

Dr. Lee later reported:

> 25. On July 3, 2017, at an MD callout, I followed up with Mr. Bernard regarding pain control following the denial of his Percocet prescription. I ordered an x-ray of his right hip, and referred Mr. Bernard to Physical Therapy and pain management.[4]
>
> 26. An x-ray done on July 6, 2017 of the right hip and frog lateral views showed mild degenerative osteoarthritis of the right hip.
>
> 27. During his physical therapy evaluation on July 21, 2017, Mr. Bernard reported that on a 0-10 pain scale, his pain was at best a 4, worst at an 8 and an average of 5.
>
> 28. On July 31, 2017, during an MD callout I examined Mr. Bernard. Due to his reports of acute pain, I admitted him to the infirmary for pain control . . . prescrib[ing] Mr. Bernard Percocet for 5 days while he was in the infirmary . . . .
>
> 30. I submitted an MWAP request for a 10-day supply of Percocet to treat Mr. Bernard beyond the 5-day emergency period. That request was not approved by RMD Mueller. In her non-approval she stated "There are also many safer alternative medications with which this patient can be treated."

(Lee Decl. [23-CV-3323, dkt. no. 136] ¶¶ 25-30.)

---

[4] The referral to pain management came some four months later, however. (Agnew Decl., Ex. 38 [23-CV-3323, dkt. no. 149-53] at 5-6.)

In explaining her denial in this litigation, Dr. Mueller stated: "When evaluating this request, I considered whether or not prescribing Percocet would cause unnecessary pain for Plaintiff, but concluded that it would not, as Plaintiff would be receiving alternative, and much safer, pain treatment modalities and/or medications." (Mueller Decl. ¶ 58.) She did not, however, specify what these treatment modalities and/or medications were and entirely ignored the fact that Mr. Bernard had been admitted to the infirmary for "acute pain." (Lee Decl. ¶¶ 27-28.)

Dr. Lee thereafter prescribed Elavil and then Cymbalta for Mr. Bernard, but Mr. Bernard eventually refused them due to side effects. (Lee Decl. ¶¶ 32, 35, 36, 42; Ex. A Part VII, Part VIII [23-CV-3323, dkt. nos. 136-7,136-9] at 38, 42.)

On August 17, Dr. Lee submitted a request to the pharmacy for Neurontin, but it was not filled without "MWAP Approval." (Lee Decl. ¶ 33.)

Dr. Lee reported:

> 37. On or about September 20 and September 21, 2017, I made two MWAP requests for Neurontin to RMD Mueller which were not approved. In the form I had indicated that I had provided Mr. Bernard with a 5-day emergency supply. RMD Mueller responded 'There should be no reason to issue an emergency supply as pt should not be taking this medication at this time.' I was also referred to a televideo training that was put on by RMD Mueller's

sister which emphasized treatment alternatives to pain other than Neurontin and Opioids.

38. On September 27, 2017, I made an MWAP request for Neurontin to RMD Mueller which was not approved.

39. On September 28, 2017, I had Mr. Bernard admitted to the infirmary for pain management in response to his complaints of pain.

40. On or about September 28, 2017, I made an MWAP request for Percocet. I noted that he was in the infirmary and the medication was being requested to treat acute pain. RMD Mueller did not approve the request.

41. On or about September 28, 2017, I also made an MWAP request for Neurontin to RMD Mueller which was not approved[.] I was told to choose a "safer agent."

(Id. ¶¶ 37-41 (emphasis added).)

In denying the request, Dr. Mueller asserted again that:

When evaluating this request, I considered whether not prescribing Neurontin would cause unnecessary pain for Plaintiff, but concluded that it would not, as Plaintiff would be receiving alternative, and much safer, pain treatment modalities and/or medications. Such alternative modalities and/or medications would, in my medical opinion, be more successful in treating Plaintiff's chronic pain.

(Mueller Decl. ¶¶ 84, 96, 107). Dr. Mueller did not specify the "pain treatment and/or medications" she thought Mr. Bernard would be receiving and again ignored his admission to the infirmary in "acute pain."  (Lee Decl. ¶ 40.)

Dr. Lee further reported:

Mr. Bernard was examined on October 12, 2017. He had refused Cymbalta due to claimed side effects and was requesting pain management. I prescribed him other

20

> alternative medications to try including Depakote and Mobic based upon the directives received from RMD Mueller my clinical supervisor. On October 12, 2017, I made a request that Mr. Bernard be referred to a pain therapy specialist. That request was denied.

(Id. ¶ 42-43.)

In February of 2018, DOCCS transferred Mr. Bernard out of Shawangunk.  (See Non-State Represented Defendants' Statement of Undisputed Facts ¶ 70.)  In late January of 2019, Mr. Bernard was in Marcy Correctional Facility ("Marcy") and the care of NP Brandi Lynn Corigliano.  (Id. ¶ 71.)  Marcy's Facility Health Services Director, Dr. Shehab Zaki, testified under oath that by 2020 no MWAP medications had been prescribed at Marcy "in years."  (Agnew Decl., Ex. 17 [23-CV-3323, dkt. no. 149-17], Transcript of Shehab Zaki ("Zaki Tr.") 44:18-45:20.)

When Mr. Bernard arrived at Marcy, he met with Dr. Robert Burdick[5] for his medical intake. Dr. Burdick recorded:

> [n]ew indraft Multiple Medical "Problems" chart reviewed. Trying to make myself stronger and better for my back surgery" (HE WANTS . . .) I want my pain, nerve meds back[.] I want my eggcrate mattress[,] I want this[,] I want that[.] I want a wooden cane. TOLD to never ask again for gabapentin, codeine, wooden cane or eggcrate mattress [sic]. NOT available at this facility. Obvious con artist and drug seeker overly solicit[ous], polite but demanding[.]

(Ramage Decl., Ex. N [23-CV-3323, dkt. no. 130-14] at 30.)

---

[5] Dr. Burdick was dismissed by stipulation and order dated June 9, 2025. (Dkt. no. 141.)

21

According to Mr. Bernard, at this interaction, a member of Marcy medical staff told him:

> [A] "[d]on't you ever ask for any type of those medications again, we don't do that here. And if you – you keep asking, we'll send you to the box."

(Declaration of Ryan E. Manley in Support of Motion for Summary Judgment, dated May 23, 2025 [23-CV-3323, dkt. no. 137], Ex. B [23-CV-3323, dkt. no. 137-2] ("Bernard Tr.") 237:20-238:23.)

When Mr. Bernard finally met with Defendant Corigliano, she noted his history of spinal stenosis. (See Non-State Represented Defendants' Statement of Undisputed Facts ¶ 76.) He again requested Celebrex, Percocet, and Neurontin, which she denied, saying "we need to try conservative therapy before I can request controlled or non-[pharmacy] substances." (See id. ¶ 77; Declaration of Brandi Corigliano, dated May 16, 2025 [23-CV-3323, dkt. no. 135] ("Corigliano Decl."), Ex. A Part I [23-CV-3323, dkt. no. 135-1] at 13.)[6]

At his medical visit on March 1, it appears that Mr. Bernard asked to "[change] med from naproxen to Celebrex," but no action was taken. (Id. at 15.) On March 4, however, NP Corigliano stated Mr. Bernard "reported Naproxen wasn't effective so [she] trialed

---

[6] Note that page numbers on Ex. A to the Corigliano Declaration are stamped numbers, not ECF.

22

him on Celebrex." (Corigliano Decl. [23-CV-3323, dkt. no. 135] ¶ 16, Ex. A Part I [23-CV-3323, dkt. no. 135-1] at 16, 25.)

On May 3, 2019, Mr. Bernard had an Orthopedics Appointment where he was diagnosed with "midline low back pain, unspecified chronicity, with sciatica presence unspecified." (Corigliano Decl., Ex. A Part II [23-CV-3323, dkt. no. 135-2] at 62.) Orthopedics recommended a referral to pain management. The radiology report noted "anterolisthesis of L3/L4" and "spinal stenosis from L3-S1 with bilateral foraminal stenosis at those levels[.]" (Id. at 60.) The plan recommended was to refer Mr. Bernard to pain management. (Id.)

NP Corigliano referred Mr. Bernard to pain management (Corigliano Decl., Ex. A Part I at 52) which recommended, inter alia, a back brace and Topomax, (Corigliano Decl., Ex. A Part II at 65). NP Corigliano, with Mr. Bernard's agreement, prescribed Topomax on July 18. (Corigliano Decl., Ex. A Part II at 68.) She also ordered a new MRI. (Id.)

The August 14 MRI showed extensive issues from L3 to S1 including congenital narrowing, diffuse bulge and facet joint arthropathy, severe stenosis and bilateral foraminal narrowing and impression on exiting nerve roots. (Agnew Decl., Ex. 33-3 [23-CV-3323, dkt. no. 149-45] at 51-52.)

NP Corigliano reported:

24. On August 28, 2019, Mr. Bernard received a right S1 transforaminal steroid injection at pain management. It was recommended that he be seen by a neurologist. There was no recommendation to adjust or change any medications (p. 81). After reviewing pain management a consult with neuro surgery was entered (81).

(Corigliano Decl. ¶ 24, Ex. A Part II at 81-82.)

NP Corigliano further reported:

25. On September 3, 2019, I saw Mr. Bernard for a routine physical and I referred Mr. Bernard to be seen by a neurologist and follow-up based upon the injection he received on August 28, 2019. I also signed a permit for Mr. Bernard to have a TENS unit, long johns (top and bottom), back and knee braces, Dr. Scholl's shoe inserts, an egg crate, and that he sleep on a low bunk on his housing unit. (p. 84; p. 123; p. 141).

(Conigliaro Decl. ¶25.)

On September 19, 2019, Mr. Bernard communicated to NP Corigliano that the injections had failed and Topomax was causing him side effects; he asked for Neurontin. (Corigliano Decl., Ex. A Part II at 84.) Corigliano refused again despite that in just the nine months since Mr. Bernard arrived at Marcy, there were twenty-five references in his records to his severe pain and need for pain management, many of which were recorded by NP Corigliano. (See Agnew Decl. Ex. 33-1 [23-CV-3323, dkt. no. 149-43] at 1, 4-7, 9-10, 13; Ex. 33-2 [23-CV-3323, dkt. no. 149-44] at 21, 24-25, 32, 34-35, 39, 41-42, 44; Ex. 33-3 at 50, 55, 58, 61.)

On January 24, 2020, NP Corigliano ordered a CT Myelogram "which was needed prior to Mr. Bernard['s] being able to see the orthopedic specialist for his spine." (Corigliano Decl. ¶ 33, Ex. A Part II at 103.) As she reported:

> 34. Mr. Bernard was seen by orthopedic surgeon Dr. Daryll Dykes on January 31, 2020, to discuss his persistent back pain, lower extremity radicular pain, numbness, tingling, and weakness. After review of Mr. Bernard's CT scan and Myelogram, Dr. Dykes opined that Mr. Bernard, "certainly has multilevel degenerative spondylosis, spinal stenosis and spondylolisthesis and these findings correlate with his symptoms and dysfunction . . . . From a surgical perspective, he would have no alternative other than multilevel revision decompression with instrumented fusion. All this would have some likely benefit, I certainly could not guarantee him success from any perspective: pain, restoration of function, restoration of strength, etc. . . . . At this point, he is inclined to continue with nonsurgical options including appropriate pain management, strengthening conditioning, and activity moderation. We did have a brief discussion about the potential role of a dorsal column stimulator as a less invasive option to help with his pain, although this will not provide appreciable benefit from the strength perspective. He states understanding and would like to pursue these nonoperative options further. Surgery is a last resort option in his mind. He will follow up as needed. (pp. 125-126).
>
> 35. I reviewed this consultation and noted the recommendation for non-operative options by pain management. I entered a request for Mr. Bernard to be seen by Pain Management.

(Corigliano Decl. ¶¶ 34-35, Ex. A Part II at 105, Ex. A Part III [23-CV-3323, dkt. no. 135-3] at 125-126.)

On February 20, 2020, Mr. Bernard saw a pain specialist who noted that "he could not tolerate Topomax" and recommended that he

"try Gabapentin [Neurontin]," that he undergo an epidural lysis of adhesions, and that he continue exercise.  (Corigliano Decl. Ex. A. Part III at 152.)

NP Corigliano questioned the Gabapentin [Neurontin] recommendation and did not act on it but instead ordered physical therapy and an epidural.  (Corigliano Decl. ¶ 37.)  In response to NP Corigliano's refusal to follow the orthopedist's recommendation and prescribe Gabapentin [Neurontin], she told Mr. Bernard "what do you want me to do, I'm giving you all I can give you right now. Nobody [even] gets Celebrex, blah-blah-blah . . . ."  (Bernard Tr. 243: 20-23.)  NP Corigliano has not denied the conversation.

Following the Allen I class action litigation, Dr. John Morley, then-Chief Medical Officer of DOCCS, asked NP Corigliano for a summary of Mr. Bernard's pain management. (See Non-State Represented Defendants' Statement of Undisputed Facts ¶ 150.) NP Corigliano wrote him back on July 21, 2020, (Corigliano Decl. ¶¶ 41-42, Ex. B[23-CV-3323, dkt. no. 135-5] at 2), but omitted to inform him of:

- Mr. Bernard's 1/27/2020 myelogram (Corigliano Decl., Ex A Part III at 116-117) and CT of the Lumbar Spine (id. at 118-119). The latter showed:

  "Lumbar CT Myelogram Impression: L3-L4: Severe bilateral facet arthropathy buckling of ligamentum flavum causing severe spinal canal stenosis and compression of cauda equina neve roots particularly descending L4 nerve roots in the lateral recesses. There is a moderate to severe

26

> narrowing of bilateral neural foramina. Grade 1 anterolisthesis is noted. L4-L5: Moderate to severe facet arthropathy is noted with the thickening of ligamentum flavum there is indentation of descending L5 nerve roots I the lateral recesses, left more than right. There is severe narrowing of left and the moderate to severe narrowing of right neural foramina. The central canal is preserved due to laminectomy."

(Id. at 119)

- Mr. Bernard's spinal x-rays on 1/31/2020 showing:

  "Findings/Impression: Rightward scoliosis of the lumbar spine remains unchanged. Stable is also mild anterolisthesis of L3 and L4. Again seen is developmentally small canal status post posterior decompression from L2-L3 down to L4-L5 level. Multilevel advanced facet arthropathy from L2-L3 down to L5-S1 level is redemonstrated. The gas pattern in the abdomen is nonspecific nonobstructive."

(Agnew Decl., Ex. 34-1 [23-CV-3323, dkt. no. 149-47] at 19.)

- The pain management specialist's recommendation of treatment of Mr. Bernard with Neurontin on 2/20/2020(Corigliano Decl., Ex. A Part III at 152).

On November 10, 2020 NP Corigliano filled out a "MWAP and Chronic Pain Patient Reassessment Form" for Mr. Bernard, in which she stated "[u]ntil this month inmate has not presented to medical since 2/2020 with complaints of pain." (Non-State Represented Defendants' Statement of Undisputed Facts ¶ 169; Agnew Decl., Ex. 34-3 [23-CV-3323, dkt. no. 149-49] at 9-11) She notes that "I was very familiar at that time with this patient. I thoroughly answered the questions on the form from my knowledge of the patient, recent physical examination and review of the medical records I had

27

available to me."   (Corigliano Decl. ¶ 48.)   Despite her self-proclaimed knowledge of Mr. Bernard's history and review of his medical records, NP Corigliano omitted the following complaints of pain by Mr. Bernard:

- Agnew Decl., Ex. 34-1, at 8 on 2/4/20 Mr. Bernard requests "pain management"
- Agnew Decl., Ex. 34-2, [23-CV-3323, dkt. no 149-48] at 1 on 2/20/20 complaint of "low back pain and [right] sciatica"
- Id. at 2 on 2/25/20 "back pain"
- Id. at 6 on 6/25/20 "low back pain"
- Id. at 9-10 on 7/30/20 "back/hip/knee pain," and "chronic back pain"  and on 8/17/20 "chronic back pain issues"
- Id. at 11 on 9/10/20 "requesting to have cortisone injections done for pain management," and 9/28/20 "lower back [andright] knee pain"
- Id. at 16 on 9/30/20 hip and knee pain and request for Neurontin
- Id. at 18 on 10/8/20 "severe lower back pain"
- Agnew Decl., Ex. 34-3 at 6 on 10/30/20 "excruciating pain"
- Id. at 6 on 11/3/20 discussing non-surgical interventions for pain before considering surgery
- Id. at 12 on 11/13/20 "Is in constant pain . . . He's in very much agony."

On December 10, 2020, Mr. Bernard was transferred from Marcy, (Corigliano Decl. ¶ 53), to Green Correctional Facility where he was prescribed Neurontin. (Bernard Tr. 243:24-245:9.)

## B. Plaintiff's Claim for Deliberate Indifference

1. Objective Prong: Whether Plaintiff Suffered a Sufficiently Serious Deprivation of Adequate Medical Care

While the Non-State Represented Defendants argue that here, no reasonable jury could conclude that Plaintiff suffered a

sufficiently serious deprivation of adequate medical care by these defendants, e.g., (Non-State Represented Defendants Summary Judgement Motion at 18), they nowhere elaborate on this argument.

In this case where Plaintiff alleges that the Defendants provided inadequate care as opposed to a failure to provide any care, as noted above, the inquiry focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract[.]" Smith v. Carpenter, 316 F.3d 178, 186 (2d Cir. 2003) (citing Chance v. Armstrong, 143 F.3d 698, 702-03 (2d Cir. 1998)). However, Defendants fail to engage in the "sufficiently serious" analysis that they propose the Court follow and that precedent demands. Even if the courses of treatment that the Defendants recommended as alternatives to Neurontin and Lyrica were "safer" because they carried fewer risks of substance abuse or addiction than did Neurontin and Percocet, (Statement of Undisputed Facts PP 21, 41, 69) opting for such alternatives came with "particular risks" of their own. See Smith, 316 F.3d at 187. Namely, the risks attributable to denying Mr. Bernard Neurontin or Percocet are that Mr. Bernard would suffer chronic and substantial pain to a greater degree than if he was prescribed either of those medications and that he would suffer greater pain than was necessary given his condition.

29

Objectively, there can be no dispute that Mr. Bernard suffered from serious medical conditions causing chronic pain. As noted above, before his admission to DOCCS in 2014, Mr. Bernard had been diagnosed with degenerative lumbar disc disease and had had a laminectomy at L4-L5 and L5-S1. (Agnew Decl., Ex. 28 [23-CV-3323, dkt. no. 149-33] at 2.) At his May 3, 2019, orthopedics appointment, Mr. Bernard was diagnosed with "midline low back pain, unspecified chronicity with sciatica presence unspecified[.]" (Corigliano Decl., Ex. A Part II at 62.) The accompanying radiology report noted "anterolesthesis of L3/L4" and "spinal stenosis from L3-S1 with bilateral foraminal stenosis at those levels[.]" (Id. at 60.) An August 14, 2019 MRI showed extensive issues from L3-S1 including "congenital narrowing[,]... diffuse bulge and facet joint arthropathy[,]... severe stenosis [and] bilateral foraminal narrowing and impression on the existing nerve roots." (Agnew Decl., Ex. 33-3 at 51-52; see also Corigliano Decl., Ex. A Part II at 76.) Dr. Daryll Dykes, after reviewing Mr. Bernard's CT scan and Myelogram, noted "the patient certainly has multilevel degenerative spondylolisthesis[.]" (Corigliano Decl. ¶ 34, Ex. A Part III at 125-26.) Mr. Bernard's admissions to the infirmary and continuing complaints of pain, at the very least, raise a question of fact as to whether the treatment prescribed by

Defendants subjected him to the risk of chronic and substantial pain.

2. Subjective Prong: whether Defendants Knew of and Disregarded an Excessive Risk to Plaintiff's Health and Safety

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Shomo v. City of New York, 579 F.3d 176, 184 (2d Cir. 2009) (citation omitted). To hold a prison official liable under § 1983 "requires a showing of more than the linkage in the prison chain of command." Ayers v. Coughlin, 780 F.2d 205, 210 (2d Cir. 1985). Instead plaintiffs must present evidence sufficient to establish that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676 (2009); accord Tangreti v. Bachmann, 983 F.3d 609, 616 (2d Cir. 2020).

Dr. Dinello

As noted above, the June 26, 2017 MWAP request was submitted to, and denied by, Dr. Mueller. Dr. Dinello merely concurred in Dr. Mueller's denial. Accordingly, Dr. Dinello's motion for summary judgment is granted.

31

Dr. Mueller

As noted above, Dr. Mueller rejected Dr. Lee's June 2017 request for a year's worth of Neurontin with the now-familiar ritual incantation that "there are safer agents without the abuse potential of Neurontin available. . . . " (Lee Decl., Ex A Part II at 9.)  In light of 1) the May 2016 EMG showing severe chronic right R5 radiculopathy, (Agnew Decl., Ex. 30 at 2), a diagnostic that she says "would be significant," (Mueller Decl. ¶ 14), and 2) that, as she noted, "[Mr. Bernard] had been receiving 1200mg of Neurontin consistently since July 2016," about a year, apparently without ill effect, (id. at ¶ 29), a question of fact is presented as to whether Dr. Mueller exercised her medical judgment in denying the MWAP requests—as she stated in her post-litigation declaration—or whether she relied reflexively on the MWAP policies—as stated in her denials of the MWAP requests.[7]  As in Ippolito v. Goord, a jury could find that Dr. Mueller acted with deliberate indifference by "reflexively rely[ing] on the purported [medical] soundness of the [MWAP policy] itself, even where [she was] on notice" by Plaintiff's past successful treatment with MWAP medications and the recommendation of outside experts and prison doctors "that a departure [from the MWAP policy] might be medically

---

[7] This is particularly so because Dr. Mueller referred Dr. Lee to a televideo training reflecting the MWAP policy "put on by RMD Mueller's sister[.]" (Lee Decl. ¶ 37.)

appropriate." No. 05-CV-6683, 2012 WL 4210125, at *13 (W.D.N.Y. Sept. 19, 2012) (internal quotations omitted); see also Johnson, 412 F.3d at 406.

Dr. Mueller also rejected Dr. Lee's August 4, 2017 request for a ten-day supply of Percocet, (Lee Decl. ¶ 30, Ex. A 34-36), his September 20 request for Neurontin, his September 28 request for Neurontin and Percocet, and his October 13 request for Neurontin. (Id. ¶ 37, 40, 41, 44.) In addition to the ritual incantation of safer alternatives, Dr. Mueller stated: "When evaluating [the June 2017] request, I considered whether or not prescribing Percocet would cause unnecessary pain for Plaintiff, but concluded that it would not, as Plaintiff would be receiving alternative, and much safer, pain treatment modalities and/or medications." (Mueller Decl. ¶ 58.) She did not, however, specify what these treatment modalities and/or medications were and entirely ignored the fact that Mr. Bernard had been admitted to the infirmary for "acute pain." (Lee Decl. ¶ 28; see also Mueller Decl. ¶¶ 84, 96, 107 (applying the same considerations to the other MWAP denials as June 2017)). Therefore, the Court cannot find that Dr. Mueller lacked the reckless state of mind necessary to violate Plaintiff's Eighth Amendment rights. As described above, the record does not show that she properly considered the "excessive risk to [Plaintiff's] health or safety"—namely, the risk of excessive

pain—that would result from denying the MWAP Request for Neurontin. See Brock, 315 F.3d at 164 (quoting Farmer, 511 U.S. at 837). Accordingly, Dr. Mueller's motion for summary judgment is denied.

As the above recitation also demonstrates, Dr. Mueller was intimately involved in Mr. Bernard's treatment, thus satisfying the requirement for personal involvement.

### Dr. Lee

The above recitation demonstrates that Dr. Lee provided attentive care to Mr. Bernard. At most, Dr. Lee delayed referring Mr. Bernard to pain therapy for four months after the recommendation to do so, but he eventually did it. (Lee Decl. ¶¶ 20, 43.)

To the extent that Mr. Bernard argues that Dr. Lee took no steps to appeal the RMDs' denial of his request for MWAP medications or otherwise deviate from the MWAP policy, the argument is unavailing. First, Dr. Lee submitted at least one MWAP request to the pharmacy without requesting approval from the RMD, but the pharmacy would not fill the request without MWAP approval. (Lee Decl. ¶ 15, 33.)

Second, the case law does not support this argument. In Griffin, a nurse administrator had denied an inmate a humidifier, because the primary treating provider's policy was to deny such

requests.  See 611 F. App'x. at 735.  The court found that "the record [was] devoid of any evidence suggesting that Nurse Smith had authority to deviate from Dr. Amatucci's policy."  Id. Ultimately, the Court held that she had been at most negligent and that as such, she was entitled to qualified immunity.  Id.  This reasoning has been followed in a number of other cases.  See, e.g., Jackson v. Sheehan, No. 16-CV-6710, 2021 WL 795313, at *6-*7 (W.D.N.Y. Mar. 2, 2021) (physician's assistant who requested treatment but was unable either to prescribe the medication himself or overrule the Chief Medical Officer's denial was entitled to qualified immunity); Tangreti, 983 F.3d at 619-20, n.7 (2d Cir. 2020) (counselor of inmate who was sexually assaulted entitled to qualified immunity in part because she "was not responsible either for procuring cameras or for York's camera policy . . . apart from discussing this problem with other officials, Bachmann had no further responsibility to resolve it"); Ippolito, 2012 WL 4210125, at *7 (treating physician's assistant not personally involved where he had no authority to override the medical director and order the requested medical treatment).

The same is true here; there is no evidence that Dr. Lee had the authority to administer MWAP medications without RMD approval or to appeal RMD disapproval.  Accordingly, Dr. Lee's motion for summary judgment is granted.

35

NP Corigliano

Upon Mr. Bernard's arrival at Marcy he requested the Gabapentin (Neurontin) he had been receiving, but dismissed Defendant Dr. Burdick relied on the apparent policy at Marcy of no MWAP medications. See Ramage Decl., Ex. N at 30.  As related by Mr. Bernard, in response to Mr. Bernard's request, a member of Marcy medical staff told him: "[d]on't you ever ask for any type of those medications again, we don't do that here. And if you – you keep asking, we'll send you to the box." (Bernard Tr. 237:14-238:4.)

Similarly, at his February 6, 2019, meeting with NP Corigliano where Mr. Bernard requested the MWAP medications he had been taking without incident, she said "we need to try conservative therapy before I can request controlled or non-[pharmacy] substances." (Corigliano Decl., Ex. A Part I at 13 (emphasis added).) Particularly in light of the threats made to Mr. Bernard upon his asking for MWAP medications, NP Corigliano's statements, on one hand, that she "need[ed] to try conservative therapy before [she could] request controlled or non-[pharmacy] substances," (id.), and "what do you want me to do, I'm giving you all I can give you now. Nobody [even] gets Celebrex. . . ." (Bernard Tr. 243:20-22), and, on the other hand, that "[b]ased on [her] training and experience, [she] believed this to be a reasonable treatment plan

36

to treat Mr. Bernard. . . " (Corigliano Decl. ¶ 16), present an issue of fact as to whether she was reflexively relying on the MWAP policy or relying on her training and experience. See Ippolito, supra, No. 05-Civ-6683, 2012 WL 421025 at *13. The same can be said about her several subsequent refusals to prescribe Neurontin in the face of expert's recommendation for Neurontin (Corigliaro Decl. ¶ 24, Ex. A Part III at 152 (pain specialist recommendation for Neurontin)), Mr. Bernard's continuing complaints of pain (detailed extensively in Section IV.A), and his prior use of Neurontin without incident.

Finally, NP Corigliano's omission in her July 21, 2020, emails to Dr. Morley of numerous imaging studies showing serious back issues and her November 10, 2020 "MWAP and Chronic Pain Reassessment Form" asserting that Mr. Bernard had "not presented to medical since February 2020 with complaints of pain" when he had so presented at least nine times raise an issue of fact as to whether those omissions and misstatements were deliberate or merely negligent.

Accordingly, NP Corigliano's motion for summary judgment is denied.

As the above recitation also demonstrates, NP Corigliano was intimately involved in Mr. Bernard's treatment, thus satisfying the personal involvement requirement.

37

Finally, as to qualified immunity, the Court adopts its previous holding in that "inmates have an Eighth Amendment right not to have prison officials rely on a policy to reject a request for a medication when the officials know it might be medically appropriate to prescribe the medication instead." Daniels, 2025 WL 949842, at *26. Moreover, because there are disputed facts on the basis of reasonableness, the Court cannot find that Defendants Mueller and Corigliano are entitled to summary judgment on the basis of qualified immunity. See Daniels, 2025 WL 949842, at *27; see also Husain v. Springer, 494 F.3d 108, 133 (2d Cir. 2007) ("[S]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.").

## V. Conclusion

For the seasons set out above:

1. Dr. Dinello's motion for summary judgment is granted;

2. Dr. Mueller's motion for summary judgment is denied;

3. Dr. Lee's motion for summary judgment is granted; and

4. NP Corigliano's motion for summary judgment is denied.

Counsel shall confer and inform the Court by letter no later than April 14, 2026, how they propose to proceed.

The Clerk of Court shall close docket numbers 126 and 132 in 23-cv-3323.

38

**SO ORDERED.**

Dated:    March 30, 2026
          New York, New York

_____
LORETTA A. PRESKA
Senior United States District Judge